PFAELZER v. GASSNER.

(Supreme Court, Appellate Term.    March 29, 1909.)

1. EVIDENCE (§ 179*)—BEST AND SECONDARY—BOOKS OF ACCOUNT—FAILURE TO PRODUCE—EFFECT—ADMISSIBILITY OF ABSTRACTS.

Nonproduction by defendant on notice of his books, on which plaintiff relied in part to prove his cause of action, did not relieve plaintiff of the burden of proof, nor authorize as a penalty the reception of plaintiff's summaries of the books, on his bare assertion that copies of entries offered by him were correct abstracts.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 596; Dec. Dig. § 179.*]

2. EVIDENCE (§ 177*)—SECONDARY EVIDENCE—GROUNDS FOR ADMISSION—BOOKS OF ACCOUNT.

Books appeared to contain but 82 accounts, and the paging, showing allowances, large and frequent, for expansions, the highest and last with 26 numbers intervening from the next prior, was but 270. Besides this, an old ledger had been continued, in which 182 pages had been used. *Held*, that the books were not so voluminous as to warrant the admission of abstracts therefrom.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 557; Dec. Dig. § 177.*]

3. EVIDENCE (§ 354*)—BOOKS OF ACCOUNT—SELF-SERVING DECLARATIONS.

On an issue as to the profits of a business out of which an employé was claiming a certain percentage as compensation, professed extracts from

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the books made by him, and summaries thereof, were as evidence in the nature of ex parte statements by him, not binding on his employer, and obnoxious to the rule against the presumption of the truth of self-serving declarations tendered by a party himself, and forbidding a man to be a witness for himself.

[Ed. Note.—For other cases, see Evidence, Dec. Dig. § 354.*]

4. MASTER AND SERVANT (§ 70*)—COMPENSATION OF EMPLOYÉ—PERCENTAGE OF PROFITS—HOW DETERMINED UNDER CONTRACT.

Where an employé was to receive in addition to his weekly salary a certain per cent. of the profits of his employer's business, computed and paid first on July 15, 1904, making one-half of the period of the contract, and the second part, the end of the contract, December 15, 1904, calculations could not be made before the expiration of such periods to determine his percentage; and, not having attempted an accounting at the end of the first period, his next opportunity would not occur till the end of the next period, on December 15th, the contract as stated and declared by him being entire.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 70.*]

5. EVIDENCE (§ 205*)—ADMISSIONS—STATEMENT TO COMMERCIAL AGENCY.

On an issue as to the profits of a business during a particular period, to determine the amount of a percentage thereof due an employé, suing therefor as compensation for services, evidence of the employer's statement of his net worth to a commercial agency was not admissible as an admission.

[Ed. Note.—For other cases, see Evidence, Dec. Dig. § 205.*]

6. MASTER AND SERVANT (§ 80*)—ACTION FOR COMPENSATION—ADMISSIBILITY OF EVIDENCE.

Such statement, referring to a date twelve weeks before the termination of the contract period, was not material; and it was irremediable error to base a charge to the jury thereon, assuming that it showed net profits of a certain amount.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 80.*]

Dayton, J., dissenting.

Appeal from City Court of New York, Trial Term.

Action by Morris F. Pfaelzer against Leopold Gassner for services. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Reversed.

See, also, 54 Misc. Rep. 579, 104 N. Y. Supp. 847.

Argued before GILDERSLEEVE, P. J., and MacLEAN and DAYTON, JJ.

Emanuel Hertz, for appellant.

Samuel P. Goldman, for respondent.

MacLEAN, J. In accord with his pleading, the plaintiff testified he engaged as employé of the defendant at $25 a week and 5 per cent. of the net profits of the business, to be computed and paid first on the 15th of July, which would mark one-half of the period of the contract, and the second part the end of the contract, the 15th of December, 1904; and he said later that his contract was made so as to determine at the close of one season, December 15th, the next season beginning right after, on December 16th. He, as he says, kept his employer's books, solicited trade from customers, sold goods, bought goods, assorted furs, in his absence made financial arrangements at the bank, obtained discounts, kept the books in double entry

form, entering the purchases, the sales, the cash received, cash paid out, notes, bills receivable, bills payable, and anything and everything showing the transactions performed. He testified to much on his direct, and tergiversated of more on his cross; but nowhere did he give competent evidence from which could or can be ascertained the net profits whereupon to compute his reward on the terms of his employment as declared in his complaint and stated in his testimony.

The defendant failing, through oversight, said his counsel, to produce his books at the outset of the trial, but agreeing to do so within an hour, the plaintiff offered and had received as secondary evidence written statements, professedly in part copies of entries in the books, in part summaries of what was shown in the book accounts. Nonproduction of the books did not relieve the plaintiff from his burden to prove his cause of action; nor did it authorize, as penalty upon the defendant, the reception of the plaintiff's conclusions, on his bare assertions that they were correct abstracts. It was, as he announced, the theory of the plaintiff's counsel, disapproved in words, but countenanced on occasions, by the learned trial justice, that it was utterly immaterial whether the books were in court or not, and that it was permissible for the court to receive in evidence extracts made by the plaintiff, independent of the appearance of the books. The books, his client said, were voluminous, and there were in them a great many pages. But his chief exhibit, his latest trial balance, betrays their little compass, shows only 82 accounts, counting in every personal account, and of the paging, showing allowances large and frequent for expansions, the highest and last with 26 numbers intervening from the next prior, is but 270; and the folios on another paper show he had continued an old ledger, in which pages up to 182 had been used.

For the indispensable starter of the accounts, to exhibit the net profits and his percentage, he produced a paper, styled "Inventory on February 5, 1904, before Beginning of Business on that Day." This he told the court was a correct abstract from the books. It was made up of eight items—five under "assets," merchandise, fixtures, bills receivable, cash in bank, outstanding open accounts; and three for merchandise, for allowances, for expenses, under "liabilities." Those, he said, were copies of what is in the books. It was received in evidence. Cross-examined thereon, he asseverated the first four items of assets were copies. Confronted with the ledger, he admitted, one by one, there were no such entries, and he admitted the like of the items of liabilities. "Net worth, $4,298.75," was the last line in this "inventory," which, it came out, he prepared when he had an examination of the books under an order of the court in 1907, three years after he left the place. Confronted again with a statement of his making, his "Statement of Percentage of Profits due to M. F. Pfaelzer * * * Nov. 1/04," presented to his employer October 31, 1904, wherein was written "Worth of L. G. on Feb. 15/04, $6,130.61," and asked to explain the disparity of nearly $2,000 (with a consequent $100 to the good of himself), he made sorry excuses of being hurried on October 31, 1904, that there must be an error in the computations of the inventory, and that he had not the same data on each occasion;

116 N.Y.S.—2

and when he had said he had all the books in 1904, and not all in 1907, and was asked how it was possible to get a more accurate inventory when you have got less books than when you have got them all, he was let out by this query being ruled out, on his counsel's objection, as argumentative, incompetent, and immaterial. The exception thereto was one of a dozen and odd marked, upon perusal of the case, as worthy of consideration.

The plaintiff was the sole witness, the cause going to the jury on his case; the defendant offering no testimony and introducing nothing in evidence, save some papers of the plaintiff's preparation. Throughout the trial the court, the complainant, and his counsel treated the books as the defendant's books, entries therein as binding upon him, and the professed extracts therefrom and summaries thereof, sorely discredited as they were, as evidence for the plaintiff. That they were not. For this controversy, they were ex parte statements of the plaintiff obnoxious to the sound rule:

"No presumption of truth arises with regard to the declarations of a party, when tendered as evidence in his own favor, since, if it were otherwise, every man, if he were in difficulty, or in view of one, might make declarations to suit his own case."

So, too, as "no man can be a witness for himself, but he is the best witness that can be against himself," the statements written by the plaintiff in 1904, while in the employment, destructively contradicted his sedulous preparations of three years later. The plaintiff said he was the sole bookkeeper, exclusively the bookkeeper. "I am the man," quoth he, "who made all the entries in the books." There is no suggestion that the defendant ever saw or knew what was, or was said to be, in the books before the plaintiff presented his computation at the end of October, 1904. Then he told the plaintiff he was mistaken, called him foolish, repudiated the bookkeeper, with his writings, and put an expert upon the books. Well enough, the plaintiff was a bad bookkeeper. The condition of his employer's business could not be learned from the books he kept. He testified that, when he began his employ, his employer gave him two slips of paper, saying:

"Here is a list of the merchandise which we have on hand. This is for the purpose of showing what we are worth. The rest of the figures you can take from the books."

These two papers, he says, were the only means of ascertaining the stock on hand, yet he did nothing with them, opened no stock book, no capital or other equivalent account, just kept the papers at home until their opportune production on this trial, excepting that he used them (if ever he had them) on the 31st of October. Of his method it is characteristic that to make up an "inventory" he wanted the ledger, purchase book, sales book, cash book, letter copying book, the journal, various inventories gotten up during the year, trial balances, checks and vouchers, and stub books.

Some of his exhibitions as an accountant were comical, whether he deceived himself, or only thought he deceived others. Thus on his arch trial balance he wrote:

"To facilitate matters in sifting items to be taken as assets or liabilities from those not classed as such, I have marked former with 'A' and the latter with 'L.'"

Making no mark either way against the merchandise and investment account, but adding an "L" to every other item in the column of credits, dubbing all the debit items, excepting allowance and expense, with "A," he made assets out of his employer's personal account, of his indebtedness to the bank, and even of his old debits.

Of his moral side, the admissions, drawn out of him by dint of cross-questioning, of the nonexistence of the pretended entries by which he would foist upon his employer a debt he could not prove, leave no need to speak more particularly. Had the plaintiff's account been true, truly kept, and so proven, he could not recover in this action. The calculations to ascertain the amount of his compensation were to be made half-yearly, on certain days, at the expiration of fixed periods, not at arbitrary times, or at the plaintiff's pleasure. In any estimation this action was prematurely brought.

The plaintiff having attempted no accounting on July 15th, his next opportunity therefor would be December 15th, the end of the specified time whereof the gross profits and losses were to constitute the elements of accounting. His contract, as he declared and stated it, was entire. His compensation did not depend upon the profits of seven-eighths or such other fractional part of a year as he might choose, disregarding the rest of the year, with its possibilities of losses in trade, falling markets, bad debts, and all the other contingencies in the business of the merchant. For the reason, if for none other, that in this action he arbitrarily shortened the period of gains and losses, and advanced the fixed date of calculation of his employer's net profits and his own compensation, the judgment the plaintiff has gotten should be reversed.

Counsel for the plaintiff protests he was precluded from showing what were the profits for the whole year. That is not what appears, but only that two questions of his for conclusions in the potential mood were duly ruled out.

Among the exceptions are notably two. A statement prepared by the plaintiff for Bradstreet's, a commercial agency, signed by the defendant, and dated September 21, 1904, wherein the defendant's net worth was stated at $20,662.80, was admitted over an objection as to its materiality, which objection was good. For whomever intended, the statement was not an admission for the plaintiff. Moreover, it referred to a date 6 weeks before his accounting, so called, and so was subject to the qualifications of the unascertainable hazard of trade in the 12 weeks following. Upon the strength of that erroneously admitted paper, the learned court charged the jury:

"Now, under a statement made by the defendant, which was offered in evidence, it was shown that the net profits on September 21, 1904, were $20,-662.80. Five per cent. thereof is $1,031.14. But by the complaint the plaintiff only demands judgment for $807.50."

The jury's verdict was for $807.50. The paper did not purport to show the defendant's profit on the day of its date, but only his capital. To arrive at the profits by the rather rude way of that paper,

one would needs deduct his "net worth" on February 15, 1904, which, according to one of the plaintiff's statements, amounted to $6,130.61, and to another, $4,298.75. The force imputed thereto in this misleading statement in the charge, duly excepted to, was therefore irremediable error, calling for reversal.

On this conclusion it is needless to comment on the many cases cited in the really voluminous brief of plaintiff's counsel. They make an interesting array of the phrases findable in the books, impairing, some actually contradicting, the common rules of evidence, for the saving of causes savable only by such help. The most helpful of them are one wherein the court bluntly overrode a technical objection to stating an amount to show a valuable consideration for an assignment of a chattel mortgage, where the amount was not material, and the other wherein the use of entries was strainedly allowed beyond the categories of secondary evidence, because to do otherwise "would be a denial of justice." The judgment appealed from should not stand.

Judgment reversed, and a new trial ordered, with costs to the appellant to abide the event.

GILDERSLEEVE, P. J., concurs in the result.

DAYTON, J. (dissenting). Defendant failed to produce his books pursuant to notice, nor did he introduce any testimony. Indeed, the record discloses a persistent effort on the part of the defense to evade, and at the same time to confuse, the issue. Plaintiff established a prima facie case, mainly upon secondary evidence, to the satisfaction of the jury. The errors complained of were not prejudicial to defendant.

The judgment should be affirmed, with costs.